Mr. Gilmore and Mr. Harville, we'll hear from you. May it please the court. My name is Douglas Harville and I have the privilege of arguing today on behalf of Arthur Gilmore in the United States v. Arthur Gilmore. Mr. Gilmore is a former member of the City Council of the City of Monroe, a position that he served in for the relevant times from approximately 2006 to 2009. We are here today because of a conviction of Mr. Gilmore of racketeering, using his position as a city councilman according to the government for corrupt purposes. The government presented four charges to the jury alleging that Mr. Gilmore had engaged in corruption in his dealings with Eddie Hakeem, a very sophisticated businessman from the City of Monroe who had a national, international business and was also a large investor in property in the Monroe area. The two acts that Mr. Gilmore was convicted of occurred from February 14th to March 27th of 2008, allegedly, and allegedly from August 25th to August 28th, 2009. These two acts were a year apart and involved two disparate dealings. That presents one problem to the government. In the United States v. Nieto, this court at 721 F. 3rd 357 in 2013 noted what has always been known, there must be at least two acts. Further, in U.S. v. Bustamante 45 F. 3rd 933, this court said that not only must they be related, there must be a threat of continuing activity. The evidence in this case showed that the only threat of continuing activity for this was the action of the government, not the action of my client, Mr. Gilmore. You look at these two acts, they're over a year apart. When the government had originally charged Mr. Gilmore, there were four acts, two of which he was acquitted of. The first is one before your honors, Rectoring Act No. 2, which occurred from February 14th, 2008 to March 27th, 2008. The second of which he was acquitted was Rectoring Act No. 3, which occurred from April 2nd, 2008 to March 2nd, 2009. The fifth Rectoring Act of which Mr. Gilmore was also acquitted allegedly occurred on July 1st of 2008. The final Rectoring Act, Rectoring Act 8, again, is what is before your honors, occurred August 25th to August 29th of 2009. In its pleading, the government made a very good case for a continuing, related, ongoing source of bribery between and racketeering between my client and Mr. Hakeem. Unfortunately, that's not what the evidence bore out. You had the jury acquitting Mr. Gilmore on 50% of the charges, leaving only to the bare minimum to hold his conviction. This presents a problem for the government. What was that first act that he was convicted of? On February 14th to March 27th, 2008, Mr. Hakeem and my client, Mr. Gilmore, allegedly were working together, and there was a bribery that allegedly occurred of $1,000 being passed from Mr. Hakeem to my client. There's a problem with that, though. And that problem comes directly from the testimony of the agent in this case. When asked about how did this $1,000 bribe, alleged bribe, occur, Agent Jared Medeiros testified, quote, that the bribe was, quote, the FBI's idea, end quote. Was this the one that was supposedly a campaign contribution? It was. It is the one that's a campaign contribution. That was never reported as a campaign contribution. That is correct. It was never reported as a campaign contribution. It was also above the maximum level that you would have to have some writing on it. The problem is that may well be a campaign violation. But what it doesn't show is that it was something that was given because Mr. Hakeem wanted to give it, something that was taken because my client wanted to take it. It was, as Agent Medeiros stated, the FBI's idea for Hakeem to bring $1,000 with him and at the end of the meeting to give it to Mr. Gilmore. So the government's plan here, and it was solely the government's plan, was here. Take $1,000. At the end of the meeting, give it to him. When you're meeting with the city councilman, what are you going to discuss? You're going to discuss city business. You're going to do what every person does who supports a political candidate, whether it be a sign in their yard, whether it be a donation, whether it be a meeting with him. If it had been reported, would he have been convicted or charged? I believe that if it had been reported, he would not have made a campaign violation, but I think it would still be something that if the jury believed it and if there were a basis for it, he could still be convicted for it. It's not whether or not he reported it. It's the purpose of why he took it that makes it a RICO crime. It's the corrupting of the process. It lends more credence to the RICO claim that it wasn't reported. It certainly is not a good thing, yes, Your Honor. It would be a piece of evidence that the jury could consider in deciding, well, listen, if he would have reported it, we would believe you. We would believe it was just a simple contribution. My point was the government didn't have control over whether it was reported or not. That is true. The government did not have permission over that, but if he had taken that $1,000 as a bribe, even if he had reported it, it wouldn't undo the fact that it was a bribe. And I think the opposite is true. Just because he didn't report it, just because he made a violation of the campaign contribution disclosure laws, does not mean that he had the intent to commit that crime or that it involved a corruption of the public office. And, again, if you look at that and you look through this conversation, what's really interesting about the conversation they have, the phone call that precedes this, there's no mention of code words. The government in its brief says, well, they were using code words during the conversation. They don't point to it. Mr. Hakeem, the government's only witness to support the corruption allegations, doesn't say they used a code word. That's something that the government makes up. There's no proof for it. What's even better and what's even more telling, and more telling than the fact that this campaign contribution wasn't reported properly, what's more telling is during this conversation in which Mr. Hakeem has been told at the end of it, no matter what's said, give him $1,000. Mr. Hakeem asked Mr. Gilmore, and the conversation goes to the printing press, and Mr. Hakeem had a printing business. And Mr. Gilmore says, oh, I paid for everything. Mr. Hakeem says, oh, well, why did you pay for everything? I always give you a discount. And Mr. Gilmore says, no, I paid for it. You have there something that shows Mr. Gilmore's true intention, his true conduct throughout this entire case. He wasn't looking for something from Mr. Hakeem. He wasn't looking for that free deal. He paid for the printing. He could have done that if he wanted to take advantage of Mr. Hakeem. He did not. You have the government setting up something. This conversation could have been about baseball. It could have been about soccer. It could have been about city business. It did not matter. The government wanted to make sure that fund would change hands. Now, even if you can find that the government, even though Agent Medeiros told it, admits it's the government's idea for this alleged bribe to go, even if Your Honors find that that's sufficient to prove against my insufficiency of evidence argument that Recreation Act II was established, then you have Recreation Act VIII, and there's no way that the government can get around Recreation Act VIII. That included, that revolved around my client doing what he was doing the entire time in this, which is trying to serve the constituents in the city of Monroe. He went to Mr. Hakeem and asked for $207 to assist a local constituent whose electricity was going to be cut off. He asked not for money so that he could put it under the table, not for money so that he could not report it. He asked for a check made payable to the local utility provider. This presented a problem. The government searched Mr. Hakeem every time before he went to a meeting and removed any money or any other forms of payment that Mr. Hakeem had and gave him only government money. Mr. Gilmore needed to help this constituent, and he asked repeatedly, I want a check made payable to the electric company. Mr. Hakeem testified at trial. I couldn't do that because I couldn't give him a check from the FBI and say, here's a check from the FBI and from the government, pay your constituent, because it would have blown his attempt to set up Mr. Gilmore. So he tells Mr. Gilmore, it's got to be cash. Mr. Gilmore tries to get the check, got to be cash. Mr. Gilmore is a public servant. He's faced with a choice. I can either take the cash and save my constituent, which is what I want to do, or I can say, no, it has to be a check. So he took the cash. But, again, this is not something that— Does the record show that he paid the bill? It does not, Your Honor. It does not? It does not, Your Honor. Does the record show that he did not pay the bill? It does not, Your Honor, and there was no evidence. And that's an interesting fact and interesting flaw in the government's case. This was supposed to be—Mr. Hakeem comes into the Louisiana State Police Office saying that there's corruption in the city of Monroe. They don't necessarily believe him. They have to build evidence. Agent Madera says that. That's the reason why in December of 2007 they fitted Mr. Hakeem up with a wire. That's why they sent him after these public officials. From 2007 to 2009, there are two racketeering activities that are the proof. That's it. Mr. Hakeem said, oh, I always had to rob him, always had to do it. But if you look at the record, there's just no evidence of that. I think one of the things that is bad, very bad for the government's case, he did have a plea agreement, and there was some corruption, and that corruption was on the part of another city councilman. That city councilman who pled guilty in a related case was not called to testify in this matter. The person who could have said that Mr. Hakeem was telling the truth, that there was corruption in the city, never came to testify. That's the problem with Mr. Hakeem's testimony and with the government's insufficient proof here. You have inference, but you do not have proof. And the government could have brought that forward. They did not. And I'm looking for the name of the government witness. It was a . . . How does this translate to error? I'm sorry? I understand the narrative you're giving us, but what precisely was the error? The error was in affirming the jury's verdict and not granting the motion for directed . . . Insufficiency of the evidence? Insufficiency of the evidence, Your Honor, because there is no proof that these were bribes. If you look to what the government said they were bribes for, there has to be an order. There has to be something that was being sought after. Well, it's like the $207. Why isn't a jury entitled to conclude that that was a bribe and it was paid in cash? And there's no evidence in the record that he, in fact, ever paid the bill, I would think. In those circumstances, the government says this is a bribe, and he has the $307 if he, in fact, had used it for that purpose. I think you would see some evidence in the record, wouldn't you? If you knew that the bill was never paid, but the government doesn't make that allegation. Why is it not a bribe, even if he's soliciting money to pay someone a constituent's bill? Because why isn't that a bribe? Because he's trying to stay in good with his constituency for his own interest. The reason why it's not a bribe is this. If you look back at the $1,000, the conversation that goes on there, all that is asked for is that Mr. Akeem asks Mr. Gilmour, give me a fair shake, do something for me. He doesn't say give me an advantage. He doesn't say do something outside the law. He says, do me, give me a fair shake, do something for me. That's what anybody approaching a politician says. That's not unjust or incorrect. The same thing with the payment. It's not incorrect to ask someone. I thought there was a specific vote discussed. I'm sorry? I thought there was a specific vote discussed. They talk about a couple of things. They talk about the Tower Armand rezoning, which is Ordinance 10995. This also shows why it's not a bribe, as does the ordinance that was involved in the other, which is 10951, which involved the settling of a lawsuit. If you look at the Tower Armand property. There is very specific discussion, as I recall, about the success before the council and about what was needed in terms of votes on the council and prior success. Almost all of that conversation is by Mr. Akeem. And if you look at this, both 10995 and 10951 were supported by Ben Kotz, who is the city councilman for Mr. Akeem. The evidence that was established at trial showed if you have the support of your councilman in your district, it's not going to be voted against. And if you look at the voting records, Mr. Akeem testified that there were 12 votes that he had before the city council. Of those 12 votes, he had five people voting in each one. He had one negative vote against him in all 12 of those votes. He had a 98.3 success rate. The purpose for this alleged bribery, the proof of this alleged bribery, is that he would never have the support of Mr. Johnson, who was another city councilman. At most, Mr. Johnson voted against him once in 12 times. Red Stevenson, the other person who pled guilty, possibly. I think it has that level of success on the council votes. Why is he giving the guy free meals? Why is he paying the hotel bills? Is he staying free at hotels? Why is he paying his way to Washington, to conferences, et cetera, when he's got all the votes in his pocket otherwise? I think he's doing exactly that. He's doing what everyone does who supports a politician. He's winding and dining them. He is not doing anything wrong. There's no showing that there was anything improper done. He's just winding and dining, and he didn't have to have the pressure. Okay, Mr. Harville, you've saved some time for rebuttal, and you can surely bring these subjects up in rebuttal if you wish. Thank you, Your Honor. Mr. Mangy. May it please the Court. I will confine my argument unless the members of the Court have questions as to the other points raised on appeal. I have a question for you. The counsel obviously didn't argue, but why wasn't the jury instructed on entrapment? Are you asking why the district court declined to give the instruction? Yes. Well, that, Your Honor, is not terribly clear because the charge conference was not recorded, and thus it's not part of the record. I can tell you that at some point the jury was not initially instructed on entrapment, obviously. It's not clear why. Are you saying that the defendant didn't request it? Yes, Your Honor. He did request it in writing, and that's clear in the record. Not in the charge? It was not given in the initial charge. Now . . . Is the point preserved? I'm saying if he requested it, it's not there. Why can't he argue it? They do argue it. You don't say in your briefs that it's not argued. It's waived, do you? No, and because what happens is . . . Why wasn't the charge given then? Defensively, why wasn't on these facts you have sufficient to ask the jury to entrapment? The question of predisposition and the usual charge. The best indication we have in the record of why it wasn't given is that the district court didn't believe the defendant had satisfied both the inducement and . . . I understand that. I certainly didn't think he ought to give it, but my question is why was that not there? When I listen to the argument itself that's being put into government's theory, you wire the guy, you go after him, you give him the cash, you do all those, and your argument is, well, we were just simply doing the . . . giving him the opportunity to do so. Now you have evidence here that he had cash and the man wanted a check, and he went back. That's evidence that strongly suggests that the jury ought to be asked the question, and he's entitled to have the jury understand that he's not . . . if he's entrapped, he can walk out of there. Your Honor, of course, there are two aspects of entrapment, inducement and predisposition. And predisposition, of course, goes to who . . . Related concepts. They are, and they do substantially overlap. The situation here that I think makes this case very different from the handful of post-Matthews cases in which this Court has found that the district court erred by not giving an entrapment instruction is that there is very little evidence that the jury could have relied on to find entrapment. For example, in two of the big cases in which an entrapment instruction should . . . What do you mean by very little? Well . . . If there's some, he ought to get the instruction. No, Your Honor, I would disagree with that because in Theogene, which is one of the cases in which this Court found the district court erred, this Court says that the defendant's story was, quote, plausible enough to go to the jury, which suggests that, you know, we've gotten away from that mere scintilla test that we used to use before the Supreme Court decided Matthews. I'm not suggesting . . . I wasn't suggesting a mere scintilla. Deal with the concrete terms of this case as just described. Do you disagree that you had the man who had cash only and that you had the subject here saying, I want a check payable to the utility company for $207, and he said it's got to be cash? Well, as Judge Jolly points out, it's still a bribe. It doesn't matter to whom the money benefits. It's still a bribe. So I would . . . The jury is still a bribe. Well, I would suggest that that doesn't undercut the fact that there's some sort of a something for something required here. Well, it does bolster the fact that here's a man that had no . . . as I understand it, and you can correct me if I'm wrong, he had no . . . there was no established predisposition to commit bribery until this one individual comes to the FBI and says that he is tired of having to pay this alderman or councilman off for all these favors. And as I understand it further, is that no investigation was done with respect to the reliability of this witness, and the record doesn't indicate any, and that it was solely on the basis of that one witness that they initiated the investigation.  You know, it's clear that predisposition can be established not just by evidence of what happens before the government's agent gets involved. You can also look at what happens in the context of the transactions. So in this particular case, and in other cases, one of the things this Court's looked at, and I cite many of them in the brief, Nelson, Ogle, is once the idea is out there, how enthusiastic or how comfortable is the defendant engaging in these conversations? So, you know, for example, if you look . . . When you send the agent, when you wire the agent and you send him in there, those agents are . . . is this the FBI? Yes, Your Honor. Yeah, okay. When they go in, they know very well what the law rules are on entrapment. They're instructed very carefully to give them . . . make it the opportunity. Don't kill our case by going in there and, in fact, make the bribe or whatever, produce the money. Make him ask for it. Make that case and just give him the opportunity. That's all we can do here. Now, you're not going to tell me that one, the operating principles under which your agent moved. Certainly, and the agent was asked, did you instruct him not to entrap anybody? And his answer was yes, but he didn't really explain what he understood that to mean. But he was asked that question, and he did answer it. That's a standard routine practice. Sure. All right. So everybody's very keenly aware when they're in there, they're going to tape the guy, and Hakem now is your guy. He's your agent. He's a government agent, and this is a conversation. I'm not suggesting that, commenting on the strength of your case and sufficiency of the evidence, but I am troubled by not giving the guy a fair opportunity to let the jury decide this. I don't know as a trial judge. I mean, that's a very heady thing to do. I'm just not going to instruct on it. Let the jury decide, for heaven's sakes. Well . . . You took that chance. The government didn't want him to give that instruction. That's correct, Your Honor. The government didn't. Now you're here to defend it. If you'd given the instruction, you'd gotten the conviction he wouldn't have this problem. The government did oppose . . . Why didn't you want him to give the instruction? Well, again, you have to look at what was presented. Judge, I'm trying to answer your question. The defendant never testifies in this case, and so you've got the government's informant testifying in some detail about bribes that were paid that were requested long before he became a government agent. So Mr. Hakem, I think that's how he pronounces his name, Mr. Hakem goes to the FBI after he's already been paying bribes to Mr. Gilmore and to Mr. Stevens, the co-defendant, for some period of time. Now, when they begin actually having their conversations . . . Excuse me. What I read was that he had, in the past, he owned some hotels and he had picked up the hotel room, whatever, and meals from time to time. And cash. Cash. And cash. There was testimony that when Mr. Gilmore would take trips, like to go to the Washington Mardi Gras, he would come to him and he would get money. And this is the point I was trying to make a little bit earlier. Is this the evidence that the witness told the FBI, and did the FBI say to him, well, let's have some documentation of that and let's confirm that this is going on? Because I don't know you, Mr. Hakem, or whoever you are, you could be trying to set this man up. I don't know. Did you, in fact, pay for these things? Is he inclined to take bribes? Show me. None of that is in the record at all. It's not. And I think Mr. Hakem was cross-examined generally on do you have any evidence, do you have any records or any documents to substantiate this? And in some instances he said, oh, yes, that would be, you know, I would have that. Is this on the witness stand? Yes. Well, I'm talking about. Before. Yeah, I'm talking about the FBI and predisposition to commit the crime and how they established that and then how they made the offer. What was the initial offer that was made by the CIA, the confidential informant? The offer to whom, Your Honor? To the alderman. Oh, the offer of substantiation. Right. What did he say? No. What did he say when he first made the offer of a bribe? In which instance? When he was under wire. In which instance? Either one? Either one. Okay. Well, I mean the first instance. What did he first say to the man?  No. While he was wired. While he was wired. Okay. After he was wired. All right. What was the first encounter that he had with the defendant and how did he approach the subject of bribery? That would be Racketeering Act No. 2. And the first event that we have in that chain, that series of events, is a phone call from Mr. Gilmore, from the defendant to the informant, saying, Eddie, please call me back. And then some amount of time passes. I think it's a couple few weeks. And Mr. Hakem explains in the recorded conversation, I'm sorry it took me so long to get back to you. I've been traveling a lot. And maybe that was right, maybe it wasn't. But that's what he says and that's what the record reflects. Then Mr. Hakem, they engage in a conversation about how did the campaign go and, you know, how's everything going with the city council. And then Mr. Gilmore says, I spent a lot of money at your printing company summit. And I'm paraphrasing all of this, Your Honor, but of course it's all in the record. There's a tape and there's a transcript. And Mr. Hakem says, yeah, we took care of you at my printing company, didn't we? And Mr. Gilmore says, nope. He says, I paid for all of it. And then Mr. Hakem says, what, you paid for it? You know, why didn't you give me a call? You know how this works. And Mr. Gilmore doesn't say, well, no, it works that I always pay for it. He says, I'm saving you for something bigger. That was a conversation that takes place on March 26th. That's Government Exhibit 19 and 19T is the transcript. So towards the end of that conversation, Hakem says, you know, I'm really going to need your help on a couple things. And he mentions a couple different projects. Can we have lunch? And Gilmore says, absolutely. And then he says, I've got X to do at the end of the week. Well, how about tomorrow? So they decide on having lunch the next day. That's Government Exhibit 20. The transcript is Government Exhibit 20T. Now, in the content, and you have to remember, of course, the trial evidence is, Hakem has testified that he's been paying, he's been giving free meals, free rooms. He's been paying cash for a long period of time. So it's not like this is the first time this has ever happened between these two men. So they sit down at a meal. They obviously know each other very well. This is not, you know, a lot of these things involve a deal. Okay, you've answered my question, which essentially, as you recited, is no illegal inducement. That's what I was driving at. So you can move on to your next point. Yeah, so that's correct. And I guess another point I really want to make clear, and I just touched on it a minute ago, and I know the Court is concerned about, well, you know, how do we know that Hakem is telling the truth on all of this? Well, one of the ways Hakem's testimony about all the prior bribes and gratuity. I don't know if we have a jury to determine that. Yes, but I think, Judge, your question is. The thing that bothers me is that the government doesn't want an entrapment instruction. They do it for a reason. And striking a balance between the risk of error and winning the case. And you thought if the prosecutor didn't think he was worried about an entrapment instruction going to the jury, he wouldn't have . . . he would have been in there telling the judge, sorting the jury together, not urging the judge to don't give an entrapment instruction. Or, in fact, if I had been an assistant United States attorney judge, please give that instruction because they're not worried about it and they know they're comfortable with it and it's the right thing to do. Well, of course, the jury picks up on entrapment. And I make the suggestion . . . But you don't have the validation from the court that this is a legal defense. Well, but then, Judge . . . You took that away from him. What happens is the jury picks up on it, sends a note to the court during deliberations, saying what is the definition of entrapment? Then there's a . . . Oh, I forgot about that. Yes. And so then there's a conversation between the judge and the lawyers about, well, what are we going to do about the jury's note? And you're right. The government takes the position he's not entitled to the instruction. And then the jury wound up acquitting him. Yes. Acquitting him on several charges. On two racketeering acts, including the one, and this is an important point, because Wait just a minute. Now, did the acquittals occur with respect to entrapment issues? Well, my position is that it's not truly an entrapment argument, even on the acquitted count. But that's the count on which he argued entrapment. Okay. Okay. Three, racketeering act. What you're saying, I guess, is, yes, he was entitled to an entrapment instruction because the jury actually found entrapment without an instruction, but we don't know how many acquittals it may have been if they had gotten an accurate instruction on entrapment. Now, what did the judge say when the jury passed the note and says, what is entrapment? All right. You mean, what was the judge's response, or what was the conversation with the lawyers? What was the judge's response? All right. The judge, they discussed, well, what do we do? And so they pull up the pattern charge. And the judge elects to give part of the pattern charge on entrapment. He basically gives the part of the pattern charge that defines entrapment. That the law forbids as a matter of policy a defendant from being convicted if he's not predisposed and the government puts the intent. Why did the judge decide to parse out the instruction and give only part of it? The record does not reflect, Your Honor. Does the record reflect that that was in response to the arguments that the government or the defense may have made? In closing argument, you mean? No, no, no, no, no, no. Oh, you mean? We're talking about the argument for the instruction or against the instruction after the jury sent the note in. Yeah. And that's what I was saying. The judge says, well, it seems to me maybe he satisfied inducement. And again, keep in mind, we've got four racketeering acts before the court now, not just the two that we're here on today.  The judge says. He has, who has satisfied. The defendant. Maybe the defendant satisfied the inducement prong. And then he says to government counsel, what do you think about predisposition? Do you think his character evidence is enough to satisfy the predisposition prong enough to send the issue to the jury? And government counsel says, well, no, judge, because you just round up a few people who will say you're a good guy and they don't know anything about the case. And that alone is not enough to carry the predisposition prong. And, of course, the law in this circuit is you have to satisfy both. So then they sort of get off that topic. What's the value if two prongs are required, why would you instruct the jury that I'm only on one prong? Well, I think what the record shows is the judge says at the end, after they have all the discussion about we're going to reopen argument, maybe we're not, what are we going to do? He says, you know, it seems to me the jury has only asked for a definition of entrapment. And that's what I'm going to give them. So he gives them the part of the instruction, the first two substantive paragraphs, that basically define what entrapment is and talk about how the defendant can't be convicted, the intent. Okay. We understand that. Okay. Why, given the fact of a jury's response, and given the arguments were made, and given the judge's ultimate concession that the instruction should be given in part, what is your argument that the court did not err when it initially refused the request for the instruction on entrapment? Well, that basically the district court was wrong on finding inducement. And we make that argument in our brief. And, Your Honor, you just, I think you just agreed with me that there probably isn't an inducement problem. And then, again, that, you know, the defendant didn't testify, so it's. I agreed that you made a case that's your case. Yes. Okay. And then, so, but we basically, just so the court is clear, we basically have two arguments. One, he's not entitled to it. And two, he got an instruction. And I don't mean to suggest that he got a perfect instruction. Okay. Okay. That's not really responsive to what, I guess maybe your response is, your response to the fact that it became a real issue in the course of the jury deliberation. Correct. Does not in any way indicate that the judge made an error when he initially refused to give it. That's what you're saying, I guess. It is our position that the judge was right not to give, on this record, in light of the fact that, you know, basically the defense was I had no intent at all, meaning I didn't do anything wrong, that doesn't mean the intent was supplied by the government. His defense, particularly, and this is very important, the two racketeering acts for which he was committed or convicted, both of those, his defense was not that he was entrapped, but that he didn't do anything wrong. You just heard his argument. These aren't bribes. That's not entrapment. The entrapment, to the extent he argued entrapment, it was on racketeering act three where he basically said the government concocted this sham on the Shrouse Plantation property that Eddie Hakem was never going to develop into a multimillion dollar subdivision. They concocted this sham to, quote, trap my client. If you look at the opening statement, if you look at cross-examination of Hakem, and if you look at closing argument, the entrapment argument is on racketeering act three for which he was acquitted. So our harmless error argument basically is he got an instruction, though certainly not a perfect one. Okay. I think we certainly have your argument, and we will now have a little rebuttal from Mr. Gilmore, please. Judge Higginbotham, in questioning counsel with government, you said the FBI is well trained. You tell your informant, give the target a chance to make a bribe. Give him an opportunity. Don't you do it. Agent Medeiros testified at trial. The idea for the bribe was the FBI's. We supplied the money, the $1,000. We determined the amount of the bribe. We gave it to him and told him to give it to him at the end. Agent Medeiros did everything that your Honor recognized a good agent shouldn't do. He didn't create a chance for a bribe. He gave a bribe and told the agent give it to him at the end of the meeting no matter what, and that's what was done. That's the entrapment, and it's that type of conduct. And the use of the shareholders' property. Ms. Gilmore wanted a house on the shareholders' property before she knew Mr. Higginbotham, before this thing started. The government knew that. They seized on it. They got that offer, and that was a racketeering act of which my client was acquitted because the government used this property that had a dear, longstanding need and want for my client to try to entrap him. They went beyond the pill. They did not give an opportunity for a bribe. They did not let my client take the chance to bribe him. They set things up. They tried to induce him. That's why the government conceded that we had the inducement factor enough for a jury charge. That's why he should not have been convicted because the government made these things happen. It didn't give a chance for my client to do them. Red Stevens pled guilty to accepting bribes from Mr. Higginbotham. Government didn't offer his testimony. Why wouldn't the government offer testimony from a co-conspirator? Because it wouldn't have implicated my client. The propensity. Did my client want to be bribed? Well, you hear about all these continuous calls. My client is constantly calling Mr. Higginbotham saying, give me money, give me seats, give me that. I want this. I want that. Mr. Higginbotham is giving it to him, according to Mr. Higginbotham. Two years of recorded conversations. That's not mentioned once. Mr. Higginbotham didn't get my client to confirm those prior calls, those prior bribes, once. Didn't do it. Wait a minute. You're denying that your client ever had any kind of relationship with Mr. Higginbotham that involved exchanges of benefits? No. No, no. He did that. I'm saying that the government never approved the bribery, the illicit nature of it, the wrong nature of it, anything more than you would when anyone else. You mean he didn't prove quid pro quo, or what are you saying? They didn't prove the prior conduct. They're saying Mr. Higginbotham says my client has a propensity to do this, a propensity to engage in bribes, because of all these past wrongdoing, all these past crimes. They didn't offer a single witness who would come up and say that. When you look at this, if you look at the Rectoring Act No. 2, that supposedly had to do with the zoning issue at Tower, Vermont. My client called character witnesses, not character witnesses who had nothing to do about this case or no knowledge of this case. He called a member of the City Zoning Administration. She said he had never done anything improper to influence them, therefore undercutting the government's claims related to Rectoring Act 2 that he had a propensity to do that. They called the city attorney who said my client had never done anything wrong, had never improperly influenced them. That's Rectoring Act No. 8, of which my client was convicted. The city attorney who would have had to have settled this lawsuit, who said my client never did anything wrong. There are no other instances of bribery other than these two acts from someone who supposedly was time and again, constantly going after it, asking for bribes, asking for improper contributions. Well, there was evidence of it. I mean, I don't think you're not saying your client was as innocent as a drill in snow. No, but what I am saying, I am not saying that, Your Honor, but I'm saying the government did not carry its burden of proving or discounting that he had a propensity to do this, to engage in this type of conduct. And when you look at the factors that the court looks to to decide if someone is predisposed, you look to a number of factors. Do they have a prior criminal history? My client has no prior criminal history. Do they have an eagerness to engage in the conduct? They did not. At the very end of a conversation that the FBI set up and said you will give $1,000 at the end of this meeting, that's when it came. My client didn't ask for anything before. You have the recorded conversation to listen to. According to the government, his bad act was calling and saying, Eddie, please call me back. That's what the government says establishes predisposition. He didn't have a desire to profit. Rectoring Act No. 8, he wanted a check. He had no eagerness, no willingness, no desire to get bribed. Okay, Mr. Harville, I think we have your argument. Thank you very much. Thank you, Your Honor.